### 25115. GORE *v*. INDUSTRIAL LOAN & SAVINGS COMPANY.

402

*George F. Fielding,* for plaintiff.

*Woodruff & Ward,* for defendant.

Jenkins, P. J.   1.   "A building and loan association, as such organizations usually exist today, is a private corporation designed for the purpose of accumulating into its treasury, by means of the gradual payment by its members of their stock subscriptions in periodical installments, a fund to be invested from time to time in advances made to such shareholders on their stock as may apply for this privilege on approved security; the borrowing members paying interest and a premium for this preference in securing an advancement over other members, and continuing to pay the regular installments on their stock in addition; all of .which funds, together with payments made by the non-borrowing members, including fines, forfeitures, and other like revenues, go into the common fund until it, with the profits thereon, aggregates the face value of all the shares in the association, the legal effect of which is to extinguish the liability incurred for the loans and advancements, and to distribute to each non-borrowing member the par value of his stock." *Cook* v. *Equitable Building & Loan Association,* 104 *Ga.* 814 (30 S. E. 911). By the act approved August 16, 1913 (Ga. L. 1913, p. 54), the term "other like associations" as provided therein, following the words "all building and loan associations," was expressly defined

to mean "a corporation organized to do a general savings and loan business, and among other things lending its funds to members of the industrial and working classes or others, and secured in whole or in part by personal indorsements and its own fully paid or installment stock, or its own fully paid or installment certificates of indebtedness, or other personal property." Code, § 16-101. The term "other like associations" applies "to all savings institutions which pay interest to depositors, and whose deposits are not subject to check." § 16-104. By the express terms of the act of 1913, embodied in the Code, § 16-101, not only "building and loan associations," but "other like associations" as defined by the act, "have authority to make loans to members of the industrial and working classes and to all other persons, due at fixed intervals not exceeding 12 months, and secured in whole or in part by personal indorsements and by its own fully-paid stock, or stock payable on the installment plan, *certificates of indebtedness,* fully paid or *payable on the installment plan,* or both indorsements and such securities, or other personal security and choses in action; and *on such loans so made and secured as aforesaid,* it shall be lawful to *deduct interest in advance,* but not to exceed 8 per cent discount, and the installment payments, if any, made on such hypothecated stock or certificates of indebtedness during the time the loan is of force may or may not bear interest, at the option of the association, and the taking of said installment payments on said hypothecated stock, certificates of indebtedness, choses in action, or other evidences of indebtedness shall not be deemed usurious." "All contracts made and securities taken in accordance with this chapter [§§ 16-101 to 16-105 inclusive] shall be valid for the full amount of principal and interest charged, and shall not be held usurious." § 16-102. But none of the sections quoted nor any part of the chapter containing them makes any reference to the charging of "premiums" on loans; and any authority for building and loan associations to charge such "premiums" must, so far as it may exist, be derived from other statutes or the general law not in conflict therewith.

Although section 5 of the act of 1890 (Ga. L. 1890, pp.176, 180, 181), embodied in the chapter comprising sections 16-201 to 16-214 inclusive of the Code, provides that "the name 'building and loan association' as used in this act shall include all corporations, societies, or organizations or associations doing a savings and loan or

investment business," namely "loaning its members, whether issuing certificates of stock which mature at a time fixed in advance or not;" yet, the language last quoted being immediately preceded by the words *on the building society plan,*" the scope of the act and of this chapter must be construed as limiting its provisions to those organizations which, by doing business on that plan, come within the scope of building and loan associations as defined by the Supreme Court in the *Cook* case, quoted above. See also *McIntosh* v. *Thomasville Real Estate &c. Co.,* 138 *Ga.* 128 (74 S. E. 1088, Ann. Cas. 1914C, 1302), and *Rooney* v. *Southern Building & Loan Association,* 119 *Ga.* 941 (47 S. E. 345), quoted in *Atlanta Loan & Savings Co.* v. *Norton,* 149 *Ga.* 805 (102 S. E. 536). Accordingly, although section 8 of the act (Code, § 16-210) provides that "no fines, interest, or *premiums* paid on loans *in any building and loan association* shall be deemed usurious, and the same may be collected as debts of like amount are now collected by law, and according to the terms and stipulations of the agreement between the association and the borrower," this authority to charge "premiums" does not inure to an association which is not actually a building and loan association, but is merely a like association by the legislative definition in the Code, § 16-101. Therefore the authority, if any, of such a like association to charge a premium against its members must be derived from some section of the Code or provision of law other than in §§ 16-201 to 16-214, inclusive.

The Code, § 57-101, makes it illegal to reserve, charge, or take for any loan or advance of money any rate of interest greater than 8 per cent. per annum, either directly or indirectly by way of commission for advances, discount, or by any contract or contrivance or device whatever. "Any person, company, or corporation violating the provisions of section 57-101 shall forfeit the entire interest so charged or taken, or contracted to be reserved, charged, or taken." § 57-112. The "small-loan" act of 1920, as amended by the act of 1935 (Code, §§ 25-301-25-319; Ga. L. 1920, pp. 215-222; Ga. L. 1935, pp. 394, 395), also makes it illegal for any person, partnership, or corporation to "charge, contract for, or receive a greater rate of interest than 8 per cent. per annum, . . except as designated by this chapter, and without first obtaining a license from the superintendent of banks." The only exception to these requirements, as contained in § 25-318, specifies banks, trust companies,

licensed pawnbrokers, and "building and loan associations," but makes no reference to "other like associations" included in the act of 1913 (§ 16-101). Such "like associations," in their charges of interest, deduction of interest in advance, and other charges, are therefore limited to the authority contained in that act and the general interest and usury statutes. While these associations have no authority, such as true building and loan associations have under § 16-210, to charge "premiums" or "fines," they are nevertheless expressly given authority by § 16-101 to sell installment certificates of indebtedness, make loans on the hypothecation of such certificates, deduct interest in advance not exceeding 8 per cent. per annum from the amounts of the loans; "and the installment payments, if any, made on such hypothecated . . certificates of indebtedness during the time the loan is of force may or may not bear interest, at the option of the association," without constituting usury. See, as to the legality of deducting interest in advance, *Taylor* v. *Consolidated Loan & Savings Co.*, 44 *Ga. App.* 512 (2) (162 S. E. 391).

Under the undisputed facts of the instant case, the defendant corporation was not a true building and loan association, but was merely a "like association" within the definition of the act of 1913 (Code, § 16-101), as construed by the Supreme Court in *Atlanta Loan & Savings Co.* v. *Norton*, supra, and was limited to the authority and restricted powers of that act. Although it appears from the statement of facts in that case that "legitimate *fines* for failures to pay the installments when due as agreed" were allowed, the questions decided by the Supreme Court did not include the legality of such "fines." Nor does it appear that such a question was dealt with or determined. In cases involving purported, or even true, "building and loan associations," "designing persons may undertake to reap an advantage under the principles of law governing [these] associations; and by pursuing forms usually adopted by such associations, may endeavor to evade the usury laws of a State. It matters not what may be the form of the contract, or the name of the enterprise undertaken; the court will always look to the substance and spirit of the transaction, and the real intention of the parties, in reaching a conclusion as to whether or not the laws on the subject of usury have been violated. . . When such an issue is properly in a case, the question thus raised, under proper instructions from the court, is one of fact for the jury." *Cook* v. *Equitable Build-*

*ing & Loan Association,* supra. Where, however, the association is a duly chartered and duly operating building and loan association, and there is "no evidence of any fraud, scheme, or device, nullifying [the] transaction as a bona·fide and regular one as it appears on the face of the documents to have been, between a legitimate building and loan association and one of its members," a verdict for such an association will be demanded. *Straub* v. *First Mutual Building & Loan Association,* 50 *Ga. App.* 491 (178 S. E. 414) ; *Taylor* v. *Consolidated Loan & Savings Co.,* supra. Similar principles control in suits involving alleged usury between "like associations" under the Code, § 16-101, and their members.

2. In the instant suit by a member of such a "like association," to recover alleged usurious interest paid by him on a loan of $200, it was admitted or undisputed in the evidence that the defendant company was either a building and loan association or a "like association." The facts of the transaction, the charter, and the by-laws show that it was a "like association," although not a true building and loan association ; that it did a general loan and savings business, accepting deposits of money on which it paid interest, but the deposits were not subject to check; that the plaintiff, in order to obtain the $200 loan, was required first to purchase two "certificates of indebtedness" of the face value of $100 each, bearing interest at 4 per cent. from their date; that the plaintiff executed a $200 note due in one year, covering the loan, and assigned the certificates as collateral; that the year's interest at 8 per cent. was deducted in advance from the $200 ; that in addition to such interest, "under the terms of the contract of purchase, the plaintiff was to pay for said certificates for a period of one year, and on the monthly deferred payments or installments the plaintiff was charged by the defendant a monthly premium of 66 2/3 cents on each certificate, or a total of $8 in premiums over a period of one year on each certificate;" that "when the last installment payment on the investment certificates had been made, the plaintiff's note for the $200 loan had matured, and at the request of the plaintiff the investment certificates for which he had fully paid were accepted by the defendant in full settlement of the $200 note;" and that "when the plaintiff paid his last installment payment on the investment certificates or certificates of indebtedness, he was given a credit of $4 on each certificate for interest accrued thereon for a period of one year."

It was not obligatory, but optional, whether the plaintiff should take up his loan note by surrendering the investment certificates. If he chose to retain them, he was entitled to continue interest thereon at 4 per cent., and to their face amount of $200 upon their surrender. Under these facts and the foregoing rulings, the plaintiff, as a "like association," doing a legitimate general loan and savings business and issuing and selling investment certificates of indebtedness, bearing 4 per cent. annual interest from date, as authorized by the Code, §16-101, was entitled to deduct in advance, as it did, 8 per cent. interest for one year from the $200 loaned. It was also authorized, at its option, in selling the two $100 investment certificates on the deferred monthly-payment plan, to charge interest on the monthly purchase-price installments. There was no evidence that its contract with the plaintiff member was a fraud, scheme, or device nullifying the transaction as a bona fide and regular one, as it appeared on the face of the documents. Its charge, therefore, of 66 2/3 cents a month, amounting to $8 for the year, on each certificate, not being in excess of authorized interest, was lawful, even though erroneously designated as a "premium;" especially since the purchasing member at the same time received 4 per cent. interest on the certificates from the date of purchase, amounting to $4 on each certificate, making the net charge for the deferred installments approximately 4 per cent. While the plaintiff at the maturity of the $200 loan surrendered the $200 of investment certificates, he could have paid the loan by cash, retaining the certificates and continuing to draw 4 per cent. interest thereon until he desired to surrender them and receive their face value. The certificates were thus analogous to 4 per cent. interest-bearing bonds, which within one year after maturity of the loan would have repaid the charges for their purchase on the installment plan, with a net gain of interest thereafter to the purchaser. The evidence shows that owners of such fully-paid certificates were also entitled to borrow on one year loans up to "the full face value thereof," at the interest rate of 8 per cent. per annum deducted in advance, without any additional charge, merely on the collateral of the certificates. The interest deducted and the charges made for the purchase of the certificates on deferred installments not having been shown to have been usurious or illegal, and therefore a verdict for the defendant being demanded by the evidence, the judge of the mu-

nicipal court, sitting without a jury, properly found in its favor, and the appellate division did not err in affirming the judgment.

*Judgment affirmed. Stephens and Sutton, JJ., concur.*